UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA J. BEAR,

                                  CASE NO. 2:17-cv-12257

        *Plaintiff*,            DISTRICT JUDGE ROBERT H. CLELAND
*v.*                           MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 16)**

I.     **RECOMMENDATION**

    In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 14), be **DENIED**, that the Commissioner's Motion, (Doc. 16), be **GRANTED**, and that this case be **AFFIRMED**.

II.    **REPORT**

    A.    **Introduction and Procedural History**

    Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Cynthia J. Bear's claim for Disability Insurance Benefits ("DIB"). (Doc.

1

4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 16).

On January 20, 2015, Plaintiff filed the instant application for DIB, alleging a disability onset date of January 9, 2015. (Tr. 108-09). The Commissioner denied her claim. (Tr. 63-74). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on March 22, 2016 before ALJ Amy Budney. (Tr. 37-62).  The ALJ issued a decision on April 14, 2016, finding Plaintiff not disabled. (Tr. 17-36). On May 11, 2017, the Appeals Council denied review, (Tr. 1-6), and Plaintiff filed for judicial review of that final decision on July 11, 2017. (Doc. 1).

### B.      Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994). If the Commissioner's decision is supported by substantial evidence, "it must be

affirmed even if the reviewing court would decide the matter differently and even if

substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations

omitted).

## C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than
> [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If
> you are doing substantial gainful activity, we will find that
> you are not disabled.

> (ii) At the second step, we consider the medical severity of
> your impairment(s). If you do not have a severe medically
> determinable physical or mental impairment that meets the
> duration requirement . . . or a combination of impairments that
> is severe and meets the duration requirement, we will find that
> you are not disabled.

3

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff not disabled under the Act. (Tr.). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 9, 2015, her alleged onset date, and that she would meet the insured status requirements of the Act through December 31, 2019. (Tr. 22). At Step Two, the ALJ concluded that the following impairments qualified as severe: rheumatoid arthritis and polyarthralgia. (Tr. 22-24). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 24). Thereafter, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except

> can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. The claimant can sit for 6 hours, stand for 6 hours, and walk for 6 hours. The claimant can occasionally use foot and hand controls bilaterally. The claimant can frequently reach overhead and in all directions. The claimant can occasionally climb ramps and stairs, stoop, balance, kneel, crouch and crawl. The claimant should never climb ladders, ropes, and

5

scaffolds. The claimant should never be exposed to unprotected heights or dangerous moving mechanical parts.

(*Id.*). At Step Four, the ALJ found Plaintiff incapable of performing her past relevant work. (Tr. 30). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 31-32).

### E.  Administrative Record

#### 1.  Medical Evidence

The Court has reviewed Plaintiff's medical records. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.  Administrative Hearing

##### i.  Function Report

Plaintiff filled out a Function Report, dated March 2, 2015, which appears in the administrative record. (Tr. 147-55). In it, she described her condition as severe swelling and pain in her hips, feet, and hands. (Tr. 147). She spent her days "around my house," and required help from family for many tasks. (Tr. 148). She "toss[ed] and turn[ed] all night" due to the pain in her "shoulders, hips, elbows and hands . . . ." (*Id.*). She could perform most personal care activities on her own, but noted that handling "buttons and zippers cause me pain," "getting in and out of [the] tub can be painful," and "I've had days where my hands were swollen and my daughter blow-dried it for me." (*Id.*). She cooked "smaller meals" in the microwave on a daily basis. (Tr. 149). "I cook only when

it's something for a short time." (*Id.*). She continued to wash the dishes, but "my family has taken over all other chores." (*Id.*). And even though she could wash dishes, she needed to rest ever fifteen minutes, so "it takes me longer now." (*Id.*). "Joint pain" and "fatigue" made all other chores too difficult for her. (Tr. 150). Every "few days" she would leave the house "to drive just around the corner," or anywhere not "more than 15 minutes" distant. (*Id.*). She shopped for groceries and household items once or twice a week, but "I always have someone go with me for help." (*Id.*). Although her "husband is the one who usually takes care of paying bills," she remained able to handle finances if necessary. (*Id.*).

Due to her condition, she whittled down her hobbies to visiting with family, watching television, and reading. (Tr. 151). "I'm not able to do many of the hobbies I use to do because of multiple joint pain has become a lot worse." (*Id.*). Elaborating, she noted that "my joint pain has been going on for years but has become more severe since around December 2014. Leaving my job and not taking care of others has made me become depressed. I find myself staying home a lot." (Tr. 152). Prompted to identify abilities with which she struggled, Plaintiff marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using her hands. (*Id.*). "[A]nything that requires joint movement I can only do for maybe 15 minutes and pain will make me have to stop and rest or reposition. My concentration has been more of a problem recently because of pain, fatigue, and depression." (*Id.*). In sum, Plaintiff reiterated that "my chronic pain and fatigue makes it impossible to work, drive in car or completing every day tasks, even filling out this paper work is so painful for my

hands I had to stop writing every 5 minutes. I am unable to work but I need an income for my family and I to survive." (Tr. 154).

### ii.      Plaintiff's Testimony at the Administrative Hearings

In the early minutes of her hearing, Plaintiff described her past work as a nursing assistant for Sunset Retirement Communities. (Tr. 42). She worked in that position for 17 years, assisting patients with activities of daily living. (Tr. 42-43). In the job, she could lift up to 100 pounds, and she was always on her feet. (Tr. 43). She left, however, because "[m]y rheumatoid arthritis became unbearable to do my job." (*Id.*). Due to "joint pain and swelling . . . it's hard for me to use my hands and do . . . the job that I was doing. My . . . hands swell and they hurt. I have multiple joints in my body that are hurting and gotten a lot worse." (*Id.*).  More specifically, she had problems with "[m]y shoulders, my elbows, my wrists, my hips, my feet, [and] my hands" on both sides. (Tr. 44). The pain in her hands and feet was "constant," though the pain swelling in her "other joints" waxed and waned. (*Id.*). She ranked—on a pain scale from 1 to 10—the pain in her hands at an 8, her feet a 7.5, her hips a 7, her wrists a 6, her shoulders a 7 to 8, and her elbows a 7. (Tr. 44-45). The ALJ then observed that Plaintiff's diagnosis of rheumatoid arthritis predated the end of her job by 7 years. (Tr. 45). To this, Plaintiff replied: "I had a lot of pain while I was at work, but it had become a lot worse. . . . [I]t would cause me to lose my balance and fall at work and . . . a lot more changes in doing my charting and it just got worse. I did work for seven years with it." (*Id.*). Eventually, she was missing work about once a month. (*Id.*). "I was missing a lot more work." (*Id.*).

Plaintiff saw a rheumatologist every three months. (Tr. 46). He treated her condition with medication, and "sometimes it will get a little better and then I feel like my body gets used to it and it starts hurting again, you know, like it was before." (*Id.*). The Methotrexate "causes me to have a lot of nausea and I've even had vomiting with it," while Humira "causes your immune system to be lower. So I have been getting colds more." (Tr. 46-47). In addition, Hydrocodone "is the pain medicine and I can get tired from that." (Tr. 47). She could walk as far as the mailbox and back before needing "to lay down a minute." (*Id.*). She could stand or sit "for about 20 minutes before my hips will start hurting me and being uncomfortable and numb." (Tr. 48). She could lift "like maybe a half a gallon of milk," but any more was "just too painful for my hands." (*Id.*). "I've dropped cups because sometimes my fingers lockup and I think I have a grip on it . . . ." (*Id.*). She also struggled with short-term memory issues. (*Id.*). Although she did not treat for depression, she noted that "I become depressed when I had stopped working." (Tr. 49). Due to problems sleeping, she typically took "a two-hour nap in the afternoon and I usually will take an hour nap later in the evening." (Tr. 50).

She received considerable help around the house from her daughters, who "have been really good helping me with like bigger amounts of dishes to do" and shopping. (*Id.*). "For the past year" before the hearing, Plaintiff had been writing a grocery list for her daughter to use; "it's just really exhausting for me just to get in the car and go to the store let alone having to, you know, get the groceries and all that. It's just exhausting." (Tr. 51). In general, "I haven't been leaving my house except for doctors' appointments." (*Id.*). Additionally, she still had issues with endometriosis, which caused abdominal pain

"like one week out of a month, sometimes two weeks out of a month." (Tr. 52). She rated the pain therefrom at a 9 out of 10. (*Id.*).

Plaintiff's counsel then inquired further into her daily activities. She noted that doing "buttons and zippers" proved painful," and that "I have a lot of trouble writing." (Tr. 53). Although she used her cell phone "to get calls and make calls if I need to," she "can't, you know, type on it very long because my hands hurt." (Tr. 54).

### ii.    The VE's Testimony at the Administrative Hearings

The VE first classified Plaintiff's prior work as "nurse assistant, DOT Code is 355.674-014. That is an SVP of 4 which is semi-skilled, medium physical demand per the DOT, very heavy physical demand per the claimant's testimony. And that would be it, Judge." (Tr. 55).

The ALJ then posed her first hypothetical question to the VE, describing a person "able to perform light exertional work activities as defined in the regulations with the following specific exertional limitations: The individual can lift, carry, push/pull 20 pounds occasionally and ten pounds frequently. The individual can sit, stand and walk for six hours. The individual can frequently handle and finger on the right and left. The individual can occasionally climb ramps and stairs, stoop, balance, kneel, crouch and crawl. The individual should never climb ladders, ropes and scaffolds, never be exposed to unprotected heights or dangerous moving mechanical parts. Can the hypothetical individual perform any of the past jobs as actually performed or generally performed in the national economy?" (Tr. 55-56). Such an individual could not perform Plaintiff's past work, but other jobs existed, including: "cafeteria attendant positions" (with 150,000

national jobs), "housekeeper, cleaner positions" (with 200,000 national jobs), and "inspector hand packager positions" (with 60,000 national jobs). (Tr. 56).

In the ALJ's second hypothetical, she added the limitation that "the individual can occasionally use foot controls on the right and left, occasionally use hand controls on the right and left and frequently reach overhead in all directions," and asked whether the jobs previously identified would still be available. (*Id.*). The VE confirmed that the same answers would apply. (*Id.*). The ALJ asked if the VE could find sedentary work for such an individual, and the VE identified several such jobs, including: "order clerk positions" (with 12,000 national jobs), "document addresser positions" (with 25,000 national jobs), and "inspector positions" (with 25,000 national jobs). (Tr. 57).

The ALJ's third hypothetical added the limitation that "the individual can occasionally finger and handle on the right and left," and the VE noted that all previous examples of available work would be eliminated. (*Id.*). Other work, however, would exist: light, unskilled "usher positions" (with 20,000 national jobs), "sandwich board carrier positions" (with 13,000 national jobs), and "bus monitor positions" (with 17,000 national jobs), as well as sedentary, unskilled "surveillance system monitor" (with 15,000 national jobs) and "election clerk positions" (with 14,000 national jobs). (Tr. 58).

In the ALJ's fourth hypothetical, she imagined an individual who "can stand and walk 15 minutes at a time for a total of 60 minutes. The individual can sit for two hours . . . at a time for a total of six hours. The individual can sit and stand at will, can carry five pounds occasionally and can stand at will, can carry five pounds occasionally and can occasionally finger, handle, reach, stoop, use hand controls, be exposed to heat, extreme

cold and fumes—dusts, odors, fumes and pulmonary irritants, can never climb, balance or be on uneven surfaces. And the individual must elevate her feet or lay down half an hour each day. Do any jobs remain?" (Tr. 58-59). The VE indicated that such an individual could not carry a full-time job.

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

13

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

confirming that objective medical evidence of the underlying condition exists. The ALJ

then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of*

*Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent

of the work-related limitations by determining the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of*

*Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's

description of his or her physical or mental impairments alone is "not enough to establish

the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless,

the ALJ may not disregard the claimant's subjective complaints about the severity and

persistence of the pain simply because they lack substantiating objective evidence. SSR

96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective

confirming evidence forces the ALJ to consider the following factors:

    (i)     [D]aily activities;
    (ii)    The location, duration, frequency, and intensity of . . . pain;
    (iii)   Precipitating and aggravating factors;
    (iv)   The type, dosage, effectiveness, and side effects of any medication .
           . . taken to alleviate . . . pain or other symptoms;
    (v)    Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Plaintiff raises two arguments in her Motion: (1) the ALJ improperly evaluated the opinion of her treating physician, Dr. Goldberger, (Doc. 14 at ID 384-88); (2) the ALJ rendered an erroneous credibility determination, (*Id.* at ID 388-92); and (3) the ALJ's decision contains "unexplained, conflicting conclusions," (*Id.* at ID 392-93). I address each argument in turn.

### 1.    Weight Accorded the Treating Physician

In Plaintiff's view, although the ALJ "stated she had considered" Dr. Goldberger's opinion, and "mentioned the applicable regulatory factors" for treating source opinions,

"she did not apply these factors to the opinion of Dr. Goldberger." (Doc. 14 at ID 385). Specifically, Plaintiff suggests the ALJ was wrong to consider "stable" physical examinations as documenting ameliorative change, and observes that the ALJ appears to base her weight-assignment on only "supportability" despite the other factors warranting consideration. (*Id.* at 385-387). In addition, Plaintiff highlights the ALJ's supposition that "Dr. Goldberger may not have been familiar with [the Act's] definition of disability" as making "little sense"—for "Dr. Goldberger did not simply state that [Plaintiff] was 'disabled' or that she could not 'work'"—and further indicating that the ALJ "failed to consider the record as a whole." (*Id.* at 386-87).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating* source's opinion." *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have

an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A.
Aug. 9, 2006). There remains an important "distinction between what an adjudicator must
consider and what the adjudicator must explain." *Id.*

I first address the notion that the ALJ mistakenly accused Dr. Goldberger of
simply declaring Plaintiff disabled under the Act. The implication underlying this claim
is that the ALJ used inapplicable boilerplate language in discounting Dr. Goldberger's
opinion, begging the question whether the ALJ *truly* considered the medical opinion at
all. The Commissioner appears to concede this, at least in part. (Doc. 16 at ID 408). I
nevertheless am mystified by the Commissioner's deference, for the ALJ's statement
remains perfectly acceptable. The final sentence in Dr. Goldberger's assessment supposes
that, because Plaintiff had recently stopped responding to a previously effective
treatment, "her functional status has become compromised." (Tr. 257). Read in context,
the ALJ's language merely addresses the possibility that this statement was, in actuality,
a conclusory finding of disability.

> Further, it is not clear that the doctor was familiar with the definition of
> 'disability' contained in the Social Security Act and regulations. Dr.
> Goldberger noted that the claimant's functional status had become
> complicated as she was waiting for possible treatment to become more
> effective, which suggests that the claimant's condition may have been
> temporarily affected. It is possible that Dr. Goldberger may have been
> referring solely to an inability to perform the claimant's past work, which is
> consistent with the conclusions reached in this decision.

(Tr. 29) (citing (Tr. 257)); *see* 42 U.S.C. § 423(d)(1)(A). Not only does this context
clarify the intent underlying the ALJ's words, but it proves she specifically considered
Dr. Goldberger's opinion.

18

In any event, the ALJ furnished other good reasons to disregard Dr. Goldberger's findings. Contrary to Plaintiff's argument, the ALJ did not equate findings of "stability" with "improvement" or "lack of impairment"; she noted findings of stability because the medical evidence on file did not corroborate any alleged deviation from the decidedly mild or normal physical findings—which she also discussed in detail, (Tr. 27-29)— peppering the record. *E.g.*, (Tr. 223-24, 227, 252, 259, 263, 267, 271, 324) (no or merely mild swelling); (Tr. 224, 226, 228, 252, 324) (full range of motion); (Tr. 224, 228, 252, 324) (no tenderness); (Tr. 224, 226, 228, 252, 289, 324) (absence of notable synovitis or arthralgia); (Tr. 271, 290) (uninhibited gait); (Tr. 271) (negative straight leg raise). Despite a transient lull in her medications' effectiveness at the time Dr. Goldberger wrote the opinion at issue, Plaintiff became "much improved remaining on Humira injections." (Tr. 324) (discussed at (Tr. 29) ("[T]he record supports that her condition improved with medication adjustments.")); *see also, e.g.*, (Tr. 223, 252, 267, 323) (demonstrating that the lapse in effectiveness of Plaintiff's medication was an exceptional occurrence). The ALJ also correctly observed that Plaintiff's treatment remained routine and conservative throughout the alleged disability period. (Tr. 29), (Tr. 223, 226, 228, 263). In sum, the ALJ supplied good reasons for discounting Dr. Goldberger's findings, and the Court should find any argument to the contrary unpersuasive.

Plaintiff's other suggestion—*i.e.*, that the ALJ only considered the supportability of Dr. Goldberger's opinion, ignoring the other factors for consideration—lacks merit as well. Not only did the ALJ list the factors for consideration before explicitly discussing Dr. Goldberger's findings, (Tr. 29), but she noted that Dr. Goldberger was a treating

physician, (*Id.*), identified him as a rheumatologist, (Tr. 26), and discussed the inconsistency of his findings both as to other record evidence and his own notes, (Tr. 26-29). The ALJ was not required to assign a specific weight to each factor.

Substantial evidence supports the ALJ's weight-assignment to Dr. Goldberger, and the Court should find Plaintiff's argument on this ground unavailing.

### 2.     Credibility Analysis

Plaintiff next argues the ALJ improperly evaluated her credibility. First, she suggests the ALJ misrepresented her testimony as exaggeration, when in fact her testimony at the hearing was consistent with her written statements in her Function Report and the Third-Party Function Report her daughter filled out. (Doc. 14 at ID 389-91). "In short, the [ALJ] misrepresents the record to find conflicts where none exist." (*Id.* at ID 391).

The ALJ did somewhat overstate the level of limitation Plaintiff testified to. She summarized certain statements as testimony "that [Plaintiff] . . . cannot button her clothing, and is unable to use her cell phone," (Tr. 28) when in fact Plaintiff testified that "she can button but it is painful to do so," and that "she cannot type on her cell phone very long because it hurts her hands," (Doc. 14 at ID 390). However poorly the ALJ phrased this observation, however, the meaning behind it—*i.e.*, that Plaintiff's alleged pain is incompatible with the mild clinical findings on file—is solidly established by the entirety of the ALJ's rationale. As she notes, "there is no evidence of muscle atrophy, significant weight loss, gross instability, or neurological deficits generally associated with prolonged severe pain on a regular and continual basis. Rather, her symptoms have

20

responded well and been alleviated with . . . therapeutic modalities." (Tr. 28); *see also* (Tr. 223-24, 226, 228, 252, 259, 263, 267, 271, 289-90, 316, 323) (showing lack of significant symptoms and/or medical improvement through routine, conservative treatment). Contrasted with the activities Plaintiff admitted an ability to do, (Tr. 28) (dressing, bathing, shaving, feeding herself, using the toilet, preparing simple meals, washing dishes, driving, spending time with her family, and smoking); *see also* (Tr. 37-62, 126-33), the ALJ reasonably found Plaintiff's more severe allegations of pain less than credible. In other words, the ALJ considered a variety of factors and reached a defensible conclusion. *See generally* SSR 96-7p, 1996 WL 374186, at *2-*3 (July 2, 1996). These additional reasons remedy whatever damage the ALJ's overstatement wrought on Plaintiff's case. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("We now make explicit what we have previously adopted by implication: harmless error analysis applies to credibility determinations in the social security disability context."); *cf. Beltran v. Comm'r of Soc. Sec.*, No. 5:15 CV 644, 2016 WL 3364923, at *8 (N.D. Ohio June 17, 2016) ("[E]ven if, as the Commissioner concedes, the ALJ overstated the observation that Beltran's 'need' for a cane was inconsistent with records showing his ability to walk without assistance, such an observation was harmless error given the existence of the other stated, supportable reasons for downgrading Beltran's credibility."); *Coleman v. Astrue*, No. 2:09-0036, 2010 WL 4094299, at *17 (M.D. Tenn. Oct. 18, 2010) ("[T]here is adequate evidence other than that which the ALJ misconstrued to support her conclusions, rendering this harmless error.").

Because Plaintiff cannot show any error in the ALJ's consideration of her credibility, I find that substantial evidence supports the weight given to Plaintiff's testimony.

### 3.      Inconsistent Findings

Plaintiff's final argument posits the ALJ's RFC assessment contains conflicting findings: on the one hand, the opinion's language is ambiguous as to whether the RFC prescribes light work or sedentary work, (*Id.* at ID 392); on the other hand, the ALJ "gives no explanation as to how a person who can only handle occasionally could lift 20 pounds occasionally and 10 pounds frequently." (*Id.* at ID 393). Neither of these claims has merit.

Admittedly, the ALJ says that "the *sedentary*, postural, and environmental limitations take into account the benign objective findings, and generously considers [sic] the claimant's subjective complaints," (Tr. 28) (emphasis added), but there seems little doubt that this erroneous specification was, at worst, a typographical error. Indeed, the RFC explicitly provided that Plaintiff was capable of "light work," (Tr. 24), and identified "representative unskilled occupations at the light exertional level" at Step Five of her analysis, (Tr. 31). The weight accorded to the State agency's physical assessment rested on its consistency with evidence that Plaintiff remained "capable of performing work at the light exertional level." (Tr. 29). Given these facts, the ALJ's reference to "sedentary" limitations plainly rings as accidental, and in any event, proves harmless. *Accord, e.g.*, *Barnes v. Comm'r of Soc. Sec.*, No. 16-13714, 2018 WL 1474693, at *8 (E.D. Mich. Mar. 6, 2018) ("The Commissioner's argument that the . . . language stating

that plaintiff does have a severe impairment reflects a typographical error is well-taken. In context, it is clear that the omission of the word 'not' was a scrivener's err, [sic] . . . . [T]he ALJ's true meaning is easily discernible for the analysis on each topic, . . ."), *R. & R. adopted,* No. 16-13714, 2018 WL 1471440 (E.D. Mich. Mar. 26, 2018); *Clayton v. Comm'r of Soc. Sec.*, No. 2:15-CV-12249, 2016 WL 5402963, at *7 (E.D. Mich. Sept. 28, 2016) ("The Court agrees with the Commissioner's explanation that this error is nothing more than a typographical error and . . . . finds that this issue constitutes harmless error."); *Badour v. Comm'r of Soc. Sec.*, No. CIV.A. 10-13280, 2011 WL 3320872, at *7 (E.D. Mich. July 18, 2011) ("[B]y itself, I would be inclined to find that the ALJ's erroneous and somewhat mysterious statement that 'mental status examinations have disclosed no abnormalities,' (possibly a typographical mistake) amounts to harmless error, given that the administrative decision contains a comprehensive, two-page discussion of Plaintiff's mental health records."), *R. & R. adopted,* No. 10-13280-BC, 2011 WL 3300673 (E.D. Mich. Aug. 2, 2011).

In addition, a finding that Plaintiff could occasionally "handle" objects and frequently "lift" up to 10 pounds is internally consistent. 'Handling' and 'lifting' are not synonymous, and the Plaintiff's lay argument carries little weight when juxtaposed with the VE's testimony that a person with such a limitation could find light work in the national economy. *See Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) ("The ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor her findings to an 'individual's particular residual functional capacity.'" (quoting *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003))).

Accordingly, the Plaintiff fails to identify any inconsistencies in the ALJ's opinion, and the Court should decline her prayer for remand on this ground.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 14), be **DENIED**, that the Commissioner's Motion, (Doc. 16), be **GRANTED**, and that this case be **AFFIRMED**.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to

which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 13, 2018                              S/ PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 13, 2018                              By s/Kristen Castaneda
                                                  Case Manager